MBIA Insurance Corporation, Plaintiff,

against
JPMorgan Securities LLC (f/k/a Bear, Stearns & Co., Inc.), Defendant.


64676/2012

Quinn Emanuel Urquhart & Sullivan, LLP 
Attorneys for Plaintiff
By: Peter E. Calamari, Esq.
Richard I. Werder, Jr., Esq.
Marc L. Greenwald, Esq.
Thomas J. Lepri, Esq.
51 Madison Avenue, 22nd Floor
New York, New York 10010 
Greenberg Traurig, LLP
Attorneys for Defendant
By: Richard A. Edlin, Esq.
Anastasia A. Angelova, Esq.
William A. Wargo, Esq.
Daniel E. Clarkson, Esq. 
200 Park Avenue
New York, New York 10166


Alan D. Scheinkman, J.

In this action to recover damages for fraudulent concealment, Defendant J.P.Morgan Securities LLC (f/ka Bear, Stearns & Co., Inc.) ("Defendant" or "Bear Stearns") moves, for the second time, for summary judgment dismissing the Complaint of Plaintiff MBIA Insurance Corporation ("MBIA" or "Plaintiff"). The action arises out of a mortgage securitization transaction in which MBIA served as the insurer, Bear Stearns as the underwriter, and GMAC Mortgage Corporation ("GMACM") as the sponsor.
This Court has already issued two significant prior Decisions and Orders which inform the disposition of the present motion, both of which are incorporated by reference herein. Familiarity with these two prior Decisions and Order is assumed for purposes of this Decision and Order.
By Decision and Order dated and entered May 6, 2014 (the "May 2014 Decision"), this Court granted summary judgment to Bear Stearns on the cause of action asserted in the original Complaint — actual fraud — on the ground that there was no evidence to support the claim that MBIA relied upon the intentional misrepresentations made by Bear Stearns. However, in doing so, the Court acknowledged that MBIA had presented evidence which suggested that there was "considerable merit to Plaintiff's unpleaded claim that Bear Stearns had a duty to disclose which it breached, giving rise to a claim for fraudulent concealment" (May 2014 Decision at 37 [footnote omitted]). Because of the existence of potentially viable, though unpleaded, claims, the Court dismissed the then extant Complaint with the proviso that Plaintiff was granted leave to move for permission to amend its Complaint.
Plaintiff moved for leave to amend and, by Decision and Order dated September 18, 2014 (the "September 2014 Decision"), this Court granted MBIA leave to interpose an Amended Complaint containing a cause of action for fraudulent concealment and that cause of action only. 
To ameliorate any prejudice to Bear Stearns from the allowance of the amendment, the Court re-opened discovery so that the parties could exchange documents and deposition testimony focused on the new issues presented by the amendment. Discovery was essentially completed by June 26, 2015 when the Court held a Trial Readiness Conference. At that Conference, counsel for Bear Stearns expressed the intention to move for summary judgment and the contours of a briefing schedule were laid out. The present motion for summary judgment was filed on August 31, 2015. Following the service and filing of opposition and reply papers, the Court held oral argument on January 30, 2016.
THE FRAUDULENT CONCEALMENT CLAIM
The background underlying MBIA's claim has already been described in the Court's prior Decisions. It is undisputed that, as a condition for the issuance of an insurance policy for a securitization transaction known as GMACM 2006 HE4, MBIA required that it be provided with a due diligence report from a third-party firm, Mortgage Data Management Corporation ("MDMC"), which was tasked to review the files of a sample of loans in the pool to assess the extent to which the loans presented exceptions to credit-related or compliance-related underwriting guidelines. MDMC began its work in early September, 2006 but by September 18, 2006, MDMC had found, and Bear Stearns was informed that, there were substantial problems. Efforts were made, in particular by John Mongelluzzo of Bear Stearns, to address the problems but ultimately, with the closing just hours away, Mongelluzzo altered the spreadsheets that MDMC had sent him, and these altered spreadsheets were sent by Bear Stears to MBIA. [*2]Unfortunately for MBIA, its personnel did not read or review the altered spreadsheets prior to closing. The Court granted MBIA summary judgment on its actual fraud claim, ruling that there was no evidence that anyone at MBIA as much as glanced at the content of the spreadsheets and that no one at MBIA actually relied on the spreadsheets or the e-mail that accompanied them.
A.The Cause of Action Alleged
In its fraudulent concealment claim, MBIA alleges that Bear Stearns knew as early as September 18, 2006 (the same day that MBIA was named as the insurer) that a review conducted by the third-party due diligence firm, had revealed substantial issues with the collateral pool of the proposed securitization transaction. Bear Stearns, it is alleged, knew that MBIA needed to know whether the due diligence results showed any issues with the collateral pool and that the receipt of such information was a condition to MBIA's issuance of insurance for the securitization. Instead of sharing MDMC's reports of September 18, 19, 20 or 25, 2006, Bear Stearns withheld this information from MBIA (Amended Complaint, ¶ 68), even though the MDMC reports would have been material to MBIA's decision to offer insurance on the transaction (id., ¶¶ 69-70). MBIA asserts that Bear Stearns withheld the information with the intent to defraud MBIA and, further that Bear Stearns' fraudulent intent is evidenced by its sending of an altered and "seemingly innocuous" due diligence report on September 27, 2006 (id., ¶¶ 70-71).
MBIA alleges that Bear Stearns had a duty to disclose the true results of the due diligence due to the contractual relationship between Bear Stearns and MBIA and, in particular, Bear Stearns' agreement to share MDMC's due diligence results with MBIA (id., ¶ 72). MBIA also maintains that Bear Stearns owed a duty to disclose the due diligence results because of Bear Stearns' superior knowledge that was not known to MBIA (id., ¶ 73), because of Bear Stearns' misleading, partial disclosures (id., ¶ 74) and because Bear Stearns engaged in active concealment (id., ¶ 75). MBIA alleges that it relied to its detriment on Bear Stearns' alleged omissions of material facts and, so relying, issued the insurance policy, leading eventually to MBIA's payment of claims on the policy of some $188 million (id., ¶¶ 76-77).
B.Relevant Evidentiary Facts
Bear Stearns was the lead securities underwriter for the transaction. As lead underwriter, Bear Stearns was involved in, among other things, soliciting bids from monoline insurers, providing insurers with the information needed to bid, working with GMACM to structure and price the transactions and select the insurer, coordinating the flow of documents and information among those involved, and retaining a third-party due diligence firm.
Bear Stearns initiated a process of inviting insurers to bid on the opportunity to insure the transaction, including the sharing of data with the bidders. On September 11, 2006, Charles Mehl of Bear Stearns sent MBIA the preliminary "loan tape", a data file which lists the attributes for the loans that would serve as the collateral for the securitization. Mehl sent a revised tape on September 13, 2006 and explained that MBIA had received updated FICO scores which were reflected in the revised tape. On September 15, 2006, Mehl sent a revised loan level and report, explaining that the "current rates for the teasers were changed to the Fully indexed rate from the teased rate."
On September 18, 2006, a Bear Stearns' e-mail identified MBIA as the insurer for the transaction. The next day, Lauren Desharnais of MBIA sent Robert Durden of Bear Stearns a [*3]proposed bid letter formally presenting conditions for MBIA's bid. It was expected by MBIA that Bear Stearns would review the bid letter with GMACM and Bear Stearns did so. On September 19, 2006, Durden advised Desharnais that, while GMACM had some comments on the bid letter, the indications were that the deal was MBIA's. Comments on the bid letter were exchanged all day between GMACM and MBIA but not directly, only with Durden of Bear Stearns as intermediary, passing the information back and forth. After the final GMACM comments were in, the MBIA representative, Lauren Desharnais, announced to the other MBIA personnel involved, that MBIA had won the bid, the announcement being made in an email sent at 9:42 p.m. on September 19, 2006.
The bid letter (the "Bid Letter") is dated September 19, 2006, was issued by Desharnais and is addressed to Sanford J. Blitzer of GMACM. The Bid Letter addresses various topics, including the premium to be paid, the ratings requirements, up-front expenses, the underlying credit enhancement structure, structure assumptions, pool assumptions, and proposed credit support. The Bid Letter contained the following paragraph relevant to due diligence:
Diligence Requirements: GMAC Mortgage and Bear Stearns agree to share loan file diligence results with MBIA.
The Bid Letter also contained a provision regarding assumptions as to the pool:
Pool Assumptions: This bid is based on the accuracy of the data file provided to MBIA by Bear Stearns & Co. To the extent that the ultimate pool differs from this on and/or the due diligence results prove materially different collateral, our overcollateralization target and fee will change accordingly.
The Bid Letter is not physically signed by anyone.
John Mongelluzzo, a Managing Director of Bear Stearns' capital markets department, coordinated Bear Stearns' due diligence efforts. Bear Stearns commissioned the third party due diligence firm, MDMC, on September 8, 2006, before MBIA was named as the insurer. The due diligence review was scheduled to take place at GMAC's location in Horsham, Pennsylvania between September 13 and 15, 2006. There is testimony that it was the market standard to have the underwriter contract with a due diligence firm to conduct the due diligence review.
MDMC's Becky Balistriere sent an email to Mongelluzzo of Bear Stearns on September 18, 2006 at 8:14 p.m. The email forwarded what Balistriere described as "final reports." She stated:
There are a large number of fails outstanding at this point. GMAC had been provided with fails on a loan level basis while we were at the site last week. As of now no cures have been received in our office from them. Please review and advise of any exceptions you may want to make as well as any comments/changes needed to the upload.
The next day, September 19, 2006, at 1:42 p.m., Janet Marrone of GMACM emailed Robert Durden of Bear Stearns that GMACM had advised Mongelluzzo that "GMACM considered the pool final with no drops." She added that it was unreasonable to have received such an extensive report from MDMC late in the previous day but that GMACM would review the report for valid exceptions and proceed within the normal course of business. She wrote further:
We asked John to let us know if there were any particular loans of concern to him, but expect that much of the report is non-material. We haven't heard from John [*4]yet today, but I would like sign off from Bear that the pool is final so that our analysts can begin to run the collateral tables (id., Ex. 22).
Durden sent this email to Jonathan Lieberman, a Senior Managing Director at Bear Stearns, advising that there was a "[b]ig issue with the on-site due diligence."
That same day, September 19, 2006, Mongelluzzo had told GMACM to "ignore the credit findings and to resolve the compliance issues." At 1 p.m. that day, Durden sent out an email in which he stated that "GMAC should have the compliance issues cleared up this afternoon, which is what John M. asked them to focus on" (id., Ex. 26).
The discussions between Bear Stearns, GMACM and MDMC regarding the resolution of due diligence issues on September 19 were taking place on the same day that Durden, who was aware of the due diligence issues, was discussing the terms of the Bid Letter with MBIA, who was not apprised of the problems. Also on September 19, 2006, Becky Balistriere of MDMC sent revised reports to Mongelluzzo, commenting that these reports had "additional comments made per your earlier email" and reporting that MDMC was continuing to "tweak" the formatting of certain fields as well as working through the data comparison to fit what he was looking for. Further revised reports were transmitted to Mongelluzzo on September 20, 2006.
Despite these efforts, on September, 21, 2006, Durden asked Mongelluzzo by email: "Do you have a clean dd report for the GMAC deal." Mongelluzzo responded: "not even close, why." In reply to the question, Durden stated: "MBIA needs it, they are wrapping the deal.". The next day, Friday, September 22, 2006, Durden emailed Mongelluzzo: "Mongo, please send the cleaned up dd report for GMAC 06-HE4, or tell us who to contact at MDMC for it, thanks."
On Monday, September 25, 2006, Victor Cascio of MDMC sent Mongelluzzo "updated reports." He advised that MDMC was "able to clear an additional 23 loans from the previous report, if you find other items that you decided to waive, please let me know and I will make the corrections." The attached reports consisted of two Excel spreadsheets, each with several worksheets, and each worksheet containing numerous rows of data about the loan characteristics and the due diligence results. The file names were "GMAC HE4-2006 MDMC DD Data File 092506.xls" and "GMAC HE4-2006 MDMC DD Issues 02506.xls."
On this record, as on the prior motion for summary judgment, there is no evidence that Mongelluzzo sent these updated reports to anyone, whether it be anyone else at Bear Stearns, anyone at MBIA, or anyone at all. Indeed, on September 26, 2006, the day after Mongelluzzo received the updated reports from MDMC, Durden emailed Mongelluzzo again: "Mongo, please send the due diligence report for this deal. We close Wednesday morning and can't get the insurer to execute their agreement if we don't have a due diligence report."
On September 27, 2006 — just a few hours before the closing — Mongelluzzo sent two Excel spreadsheets to Durden via email. The text of the email states: "I got these cleaned up as best I could. Still some data that is missing but most of the holes have been filled in." The files were named "GMAC HE-4 MDMC DD Data File 092506 II.xls" and GMAC "HE-4 MDMC DD Issues 092506 II.xls."
There is evidence that the spreadsheets that Mongelluzzo sent to Durden did not contain certain information that was included in the spreadsheets that MDMC had sent to Mongelluzzo, such as, inter alia, columns that showed failing credit and compliance grades assigned by MDMC, columns with negative commentary about the loans, and cells in which the text [*5]"Unacceptable Compliance" was changed to "Acceptable".
On September 27, 2006, about an hour after receiving the email from Mongelluzzo, Durden sent an email to Carl Webb and Desharnais of MBIA. Desharnais was a Director in the New Business Group at MBIA and Webb was her supervisor. The email was not sent directly to Theresa Murray, who was a director at MBIA responsible for credit risk and chairing the Underwriting Committee for the 2006-HE4 Securitization.
The email was headed: "GMAC 2006-HE 4 DUE DIL REPORT." The text of the email reads:
Attached is the due diligence report for the above deal, let me know if you have any questions.
Attached to the email was one Excel spreadsheet: "GMAC HE4-2006 MDMC DD Data File 092506 II.xls." Durden had combined the two spreadsheets he had obtained from Mongelluzzo into one.
The closing of the transaction occurred on September 27, 2006 as scheduled. As this Court previously held, there is no evidence that anyone at MBIA so much as glanced at the purported due diligence report prior to closing. Accordingly, the Court held that MBIA could not establish that it had relied upon a report which none of its employees ever read, much less reviewed, prior to closing.
Additional facts will be addressed as part of the legal discussion.
THE SUMMARY JUDGMENT STANDARD
The proponent of a motion for summary judgment carries the initial burden of production of evidence as well as the burden of persuasion (Alvarez v Prospect Hosp., 68 NY2d 320 [1986]). The moving party must tender sufficient evidence to demonstrate as a matter of law the absence of a material issue of fact.[FN1]
Failure to make that initial showing requires denial of the motion, regardless of the sufficiency of the opposing papers (Winegrad v New York University Med. Center, 64 NY2d 851, 643-644 [1985]; St. Luke's-Roosevelt Hosp. v American Tr. Ins. Co., 274 AD2d 511 [2d Dept 2000]; Greenberg v Manlon Realty, Inc., 43 AD2d 968 [2d Dept 1974]). Once the moving party has made a prima facie showing of entitlement of summary judgment, the burden of production shifts to the opponent, who must now go forward and produce sufficient evidence in admissible form to establish the existence of a triable issue of fact or demonstrate an acceptable excuse for failing to do so (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Tillem v Cablevision Sys. Corp., 38 AD3d 878 [2d Dept 2007]).
The court's main function on a motion for summary judgment is issue finding rather than issue determination (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395 [1957]). Since summary judgment is a drastic remedy, it should not be granted where there is any doubt as to the existence of a triable issue (Rotuba Extruders, Inc. v Ceppos, 46 NY2d 223 [1978]). Thus, when the existence of an issue of fact is even arguable or debatable, summary judgment should be denied (Stone v Goodson, 8 NY2d 8 [1960]; Sillman v Twentieth Century Fox Film Corp., supra). In reviewing a motion for summary judgment, the Court must accept as true the evidence [*6]presented by the nonmoving party and must deny the motion if there is "even arguably any doubt as to the existence of a triable issue" (Baker v Briarcliff School Dist., 205 AD2d 652, 661-662 [2d Dept 1994]).
THE STANDARD FOR A CLAIM OF
FRAUDULENT CONCEALMENT OF MATERIAL FACTS
It is well established that " [t]he mere nondisclosure of a material fact, unaccompanied by some deceptive act, does not constitute fraud absent a confidential or fiduciary relationship" (Sanford/Kissena Owners Corp. v Daral Props., LLC, 84 AD3d 1210, 1211 [2d Dept 2011], quoting First Keystone Consultants, Inc. v DDR Constr. Servs., 74 AD3d 1135, 1138 [2d Dept 2010]). As the qualifying language in the quotation implies, while mere nondisclosure, standing alone, is not generally actionable, if the defendant does more than just stay silent and engages in deceptive acts, there are circumstances under which liability may be imposed. "In business [transactions], an affirmative duty to disclose material information may arise from the need to complete or clarify one party's partial or ambiguous statement .... or from a fiduciary or confidential relationship between the parties ....Such a duty may also arise .... where: (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge" (Banque Arabe et Internationale D'Investissement v Maryland Natl. Bank, 57 F3d 146, 155 [2d Cir 1995]).
An active concealment is substantively the same as an affirmative misrepresentation (60 NY Jur 2d, Fraud and Deceit § 88). Active concealment implies purposeful misrepresentation, i.e., the Defendant's affirmative attempt to hide something (London v Courduff, 141 AD2d 803 [1st Dept 1988], lv dismissed 73 NY2d 809 [1988]). When there has been an active fraudulent concealment, a duty to speak arises even in the absence of a confidential, fiduciary or contractual relationship (Clement v Delaney Realty Corp., 83 AD3d 881 [2d Dept 2011]; Haberman v Greenspan, 82 Misc 2d 263 [Sup Ct, Richmond County 1975]).
The elements for a cause of action of fraudulent concealment are: (1) an omission of a material fact; (2) intent to defraud; (3) duty to disclose, (4) reasonable reliance on the omission, and (5) damages suffered (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011]). The elements of fraudulent concealment are the same as the elements required for fraudulent misrepresentation with one addition — it must be shown that "the defendant had a duty to disclose material information and that it failed to do so" (P.T. Bank Central Asia v ABN Amro Bank, N.V., 301 AD2d 373, 373 [1st Dept 2003]). As with fraudulent misrepresentation, fraudulent concealment must be established by clear and convincing evidence (Banque Arabe et Internationale D'Investissement v Maryland Natl. Bank, supra, 57 F3d at 153).
BEAR STEARNS' MOTION FOR SUMMARY JUDGMENT
In support of its motion for summary judgment, Bear Stearns presents three principal arguments. First, Defendant argues that there is no evidence that MBIA relied on Bear Stearns' "supposed silence" in deciding to insure the transaction. Second, Defendant contends that any such reliance would not be reasonable since MBIA, as a sophisticated business entity, had an obligation to protect itself by doing its own investigation into the details of the transaction. Third, Bear Stearns argues that it did not owe MBIA any affirmative duty to disclose the results of the due diligence review. MBIA disputes all three points.
[*7]THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER
BEAR STEARNS OWED MBIA A DUTY TO DISCLOSE
The threshold issue is whether, as a matter of law, Bear Stearns did not owe MBIA any duty to disclose material omitted facts. That issue turns in large measure on what material facts are claimed by MBIA to have been withheld from it. As pleaded in the Amended Complaint, MBIA alleges that, rather than sharing MDMC's reports of September 18, 19, 20 or 25, 2006 with MBIA, Bear Stearns withheld this information, despite evidence suggesting that MBIA was asking for the MDMC report. The Court holds that, contrary to Bear Stearns' position, there are genuine issues of fact as to whether Bear Stearns owed MBIA a duty to disclose both the MDMC reports as well as the reasons why Bear Stearns had not forwarded them to MBIA and the actions of Bear Stearns in altering the final MDMC reports rather than sending them along to MBIA.
The general rule is that, "[i]n the absence of a contractual relationship or a confidential or fiduciary relationship, a party may not recover for fraudulent concealment of fact, since absent such a relationship, there is no duty to disclose" (900 Unlimited, Inc. v MCI Telecom. Corp., 215 AD2d 227, 227 [1st Dept 1995]). While the relationship between MBIA and Bear Stearns cannot conceivably be characterized as confidential or fiduciary, there is evidence that supports the characterization of the relationship as contractual, at least with respect to the MDMC reports.
MBIA transmitted the Bid Letter, essentially an offer to provide insurance on specified terms, to Bear Stearns, as intermediary for GMACM. The MBIA offer called for Bear Stearns and GMACM to share certain information — the loan file diligence results — with MBIA. Bear Stearns was aware that the offer called for Bear Stearns and GMACM to share the due diligence results with MBIA. There is evidence that MBIA's offer — to provide insurance on specified terms, including provision of the due diligence results — was accepted by both GMACM and Bear Stearns.
The MBIA offer called for Bear Stearns and GMACM to share certain information — the loan file diligence results — with MBIA. There is evidence that this offer was accepted by both GMACM and Bear Stearns; Bear Stearns and GMACM embarked on a due diligence process and ultimately shared information with MBIA. Indeed, if the "loan file diligence results" mean the results developed by the third party due diligence firm (MDMC), then it may be concluded, by not providing the final MDMC product to MBIA, Bear Stearns failed in a contractual duty owing to MBIA. 
While the Bid Letter does not specify the time by which the due diligence results were to be shared, it may be implied that the results were to be shared within a reasonable time (see, e.g., Savasta v 470 Newport Assocs., 82 NY2d 763 [1993]; Klein v Klein, 134 AD3d 1066 [2d Dept 2015]).
Similarly, while the Bid Letter does not define "loan file results," there is evidence in this record that would support a finding that loan file due diligence results refers to the findings and report of the third-party due diligence firm, independent of input from the underwriter and/or seller. While Bear Stearns argues that the due diligence process is "iterative", there are clear issues of fact as to the amount, if any, of input in, and control over, the third party due diligence firm that the underwriter and seller were permitted or expected to exercise. Moreover, there is no evidence that, after Mongelluzzo altered the reports, he offered MDMC the opportunity to review and comment on his changes. Thus, there is no evidence that MDMC approved or sanctioned, or [*8]would have approved or sanctioned, the reports as submitted by Bear Stearns. In other words, no matter how "iterative" the process may have been up to a point, the evidence on the record shows that the final work product was turned over to MBIA without prior approval or consent of MDMC. No matter how interactive the process had been prior to September 25, 2006, and no matter how willing MDMC may have been to work with Bear Stears to clear issues prior to that date, once MDMC's last report was in, Bear Stearns made more changes without input from MDMC.
It may be readily inferred from the Bid Letter, and from evidence as to industry practice, that the loan file diligence results that were supposed to be shared with MBIA were the results of the review by the third-party due diligence firm, rather than results of a due diligence review by Bear Stearns. Indeed, it would hardly make sense for the process to involve a third-party due diligence firm if a due diligence review by an underwriter was acceptable, at least a reasonable finder of fact could so conclude.
Moreover, the Court notes that, when Bear Stearns sent a revised "loan tape" on September 13, 2006, the Bear Stearns employee specifically noted for MBIA that the tape had been revised by Bear Stearns and briefly explained why it had been revised. It is a question of fact as to whether Bear Stearns should either have sent the MDMC reports to MBIA without alteration or whether Bear Stearns should have at least briefly noted that it was revising the reports and explained why or whether Bear Stearns conduct, as it was, was proper.
Bear Stearns argues that it was not a named party to the Bid Letter, since that document was addressed to GMACM and was issued by MBIA and, therefore, it was not bound to provide the MDMC information. However, that argument is much too facile and ignores the reality of the transaction as it occurred. There is no dispute that the terms of the bid (which found their way into the Bid Letter) included the requirement that both Bear Stearns and GMACM agree to share the results of the loan file due diligence with MBIA. That provision was not limited to GMACM; Bear Stearns was specifically named as a party to the obligation to provide the due diligence results. The evidence shows that the terms of MBIA's bid were disclosed to Bear Stearns, that Bear Stearns consulted with GMACM as to those terms, negotiated changes, and then Bear Stears accepted those terms. Hence, there is ample evidence, if not undisputed evidence, that Bear Stearns, along with GMACM, agreed to share the due diligence file results with MBIA. Indeed, there is deposition testimony from GMACM's transaction manager that it was Bear Stearns' job in this transaction to send the due diligence results to MBIA. Further, there is significant evidence that Bear Stearns served as the intermediary between MBIA and MDMC, just as it served as the intermediary between MBIA and GMACM.
Furthermore, the evidence would support the view that Bear Stearns, even if it did not perceive that it was acting in pursuit of its own contractual agreement with MBIA in relation to the due diligence results, was acting as agent for GMACM. Bear Stearns does not contest, nor could it, that GMACM had a contractual obligation to share the due diligence results with MBIA. The evidence would support the view that Bear Stearns was acting for GMACM in executing GMACM's responsibility with respect to due diligence. It is well settled that an agent may be held liable for fraud committed by the agent in the course of the agent's actions on behalf of a disclosed principle (see Laska v Harris, 215 NY 554 [1915]). Thus, Bear Stearns can be held liable for fraud committed by it in the course of its acting as agent for GMACM in regards to due [*9]diligence.
The Court does not accept Bear Stearns' contention that the Bid Letter, and its obligation to share the due diligence results with MBIA, was superceded by other documents. 
The first document upon which Bear Stearns relies is a letter agreement between MBIA and GMACM relating to MBIA's premium and the fees of its accountant and counsel (the "Premium Letter"), which was effective upon closing. Bear Stearns points out that the Premium Letter contains a provision stating that it represents the parties' agreement as to the subject matter and that there are no other promises or representations made by the parties relative to the subject matter. But, as Bear Stearns points out, the Premium Letter contains no reference whatsoever to due diligence; hence, the due diligence obligations of the parties cannot be said to be part of the "subject matter" of the Premium Letter. Indeed, the precise point of the lawsuit is that MBIA contends that it would not have entered into the transaction at all had Bear Stearns not engaged in fraudulent conduct in relation to due diligence. Further, to the extent that Bear Stearns undertook on its own behalf to share the due diligence results with MBIA, the Premium Letter did not recant that obligation since Bear Stearns was not a party to the Premium Letter. Moreover, the Bid Letter specifically contemplated, among other things, that if the due diligence results prove materially different collateral, the overcollateralization target and fee will change accordingly. Thus, had the MDMC due diligence results been shared, MBIA may have walked from the deal entirely prior to closing, in which case the Premium Letter would not have been entered into or MBIA may have sought increases in collateral or in its fees, in which event the Premium Letter may have had different terms.
The second document relied upon by Bear Stearns is an agreement whereby MBIA agreed to issue an insurance policy on the closing date (the "Insurance Letter"). While the Insurance Letter is dated as of September 1, 2006, it, along with several of the other documents referred to by Bear Stearns, provided for the obligations and rights of the parties upon and after the closing of the transaction. None of these documents vitiate the obligations of Bear Stearns to share due diligence results with MBIA as previously agreed.[FN2]

There is an additional ground for the imposition of a duty to disclose the MDMC reports, one which also was addressed in the May 2014 Decision (at 37-38):
In addition, there may be a duty to disclose, which is not limited to parties in privity of contract, when nondisclosure would lead the person to whom it was or should have been made to forego action that might otherwise have been taken for the protection of that person (Strasser v Prudential Sec., Inc., 218 AD2d 526 [1st Dept 1995]). Here, a potential viable fraud claim may be predicated either upon the theory that Bear Stearns had special knowledge not available to MBIA or that Bear Stearns' responses to MBIA's requests for delivery of the due diligence information were misleading in that they failed to disclose the problems known to Bear Stearns and/or failed to disclose that the delivery was being delayed by Bear Stearns' effort to alter the results (see Williams v Sidley Austin Brown & Wood, L.L.P., 38 AD3d 219 [1]st Dept 2007).
Under the "special facts" doctrine, a duty to disclose arises "when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair" (Pramer S.C.A. v Abaplus Intl. Corp., 76 AD3d 89, 99 [1st Dept 2010]; Swersky v Dreyer and Traub, 219 AD2d 321 [1st Dept 1996]. In Jana L. v West 129th Street Realty Corp. (22 AD3d 274 [1st Dept 2005]), the court ruled that the "special facts" doctrine is subject to qualification:
[This] doctrine requires satisfaction of a two-prong test: that the material fact was information "peculiarly within the knowledge" of [defendant], and that the information was not such that could have been discovered by [plaintiff] through the " exercise of ordinary intelligence'" (Black v. Chittenden, 69 NY2d 665, 669, 511 N.Y.S.2d 833, 503 N.E.2d 1370 [1986], quoting Schumaker v. Mather, 133 NY 590, 596, 30 N.E. 755 [1892] ["if the other party has the means available to him of knowing ... he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentation"] (Jana L., 22 AD3d at 278).
Bear Stearns agreed to provide the due diligence results to Plaintiff and it may be inferred that it was obligated to do so within a reasonable time of receipt of the results from the third party due diligence firm. However, instead of forwarding those results when they first came in from MDMC some 9 days before the closing, Bear Stearns withheld them from MBIA, delayed providing them despite requests for them from MBIA, used the time to make alterations to the results, and then sent the altered results to MBIA at the last minute. While Bear Stearns may not have known that Desharnais was traveling, it may be that the last minute nature of the transmission was intended to prevent MBIA from having a meaningful opportunity to review the results (May 2014 Decision at 36-38).
As noted in footnote 24 of the May 2014 Decision, these facts may support a finding that Bear Stearns engaged in acts of active concealment, as what is involved here is more than mere silence and inaction. Active fraudulent concealment may be found to give rise to a duty to speak (Clement v Delaney Realty Corp., 83 AD3d 881 [2d Dept 2011]; Haberman v Greenspan, 82 Misc 2d 263 [Sup Ct, Richmond County 1975]). Of course, to support a claim based on active concealment, MBIA will have to show that Bear Stearns' actions thwarted MBIA's own efforts to fulfill its own responsibilities to protect itself (see Jablonski v Rapalje, 14 AD3d 484 [2d Dept 2005]).
In sum, there is no basis for concluding that Bear Stearns has shown that, as a matter of law, it was not subject to a duty to disclose the MDMC reports to MBIA.
THE ISSUE OF RELIANCE
The parties do not dispute that, to maintain its cause of action, MBIA must show that it reasonably or justifiably relied on the failure of Bear Stearns to disclose material information. Bear Stearns argues both facets of the requirement, i.e., (1) that there is no evidence from which it can be concluded that MBIA relied upon its silence; and (2) there is no evidence from which it can be concluded that any such reliance by MBIA was reasonable or justified.
THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER
MBIA ACTUALLY RELIED ON BEAR STEARNS' FAILURE TO DISCLOSE
In actions founded on fraud, the fraud and injury must be connected. "The one must bear to the other the relation of cause and effect; not, perhaps, in so close a sequence as in action on contract, but nevertheless it must appear in an appreciable sense that the damage flowed from the fraud as the proximate, and not the remote, cause" (Brackett v Griswold, 112 NY 454 [1889]). It is not necessary that the fraud have been the exclusive cause of the plaintiff's action or non-action; it is sufficient if the fraud was a substantial factor in inducing the plaintiff to act or to refrain from acting (State Street Trust Co. v Ernst, 278 NY 104, 122 [1938]; Curiale v Peat, Marwick, Mitchell & Co., 214 AD2d 16, 27 [1st Dept 1995]; 2 PJI3d 3:20). And, as noted above, to the extent that MBIA's claim sounds in active concealment, MBIA will be required to show that Bear Stearns' action thwarted MBIA's own efforts to protect itself.
Bear Stearns argues that MBIA's witnesses testified that MBIA would not have relied on mere silence from the underwriter as an indication that there were no issues with the collateral. The cited testimony includes testimony to the effect that MBIA would not shortcut its own due diligence processes and would not rely upon someone else to do its work for it. Also, argues Bear Stearns, MBIA's witnesses testified that MBIA would never have provided Bear Stearns with any information about what due diligence results MBIA would have found acceptable. Hence, it is contended, Bear Stearns had no insight into what would constitute a serious issue that would have caused MBIA to refuse to proceed to issue an insurance policy.
Bear Stearns' argument would have relevance if what happened here was that Bear Stearns simply passed along the final MDMC report in a timely, unedited fashion. But that is not what the evidence shows happened. The issue here is not whether MBIA relied on some form of generic "silence", but whether MBIA relied upon, or was thwarted in its exercise of its own ability to protect itself by, Bear Stearns' failure to provide MBIA with unedited, but available, MDMC due diligence reports prior to closing and Bear Stearns' failure to explain the reasons for the delayed transmission, i.e., that Bear Stearns was taking up to the last minute so that the results could be unilaterally doctored. Since Bear Stearns has not provided any evidence that Bear Stearns did not so rely on the failure to produce the MDMC reports prior to closing, it cannot be said that Bear Stearns has made out a prima facie case for summary judgment on the issue of reliance.
Even if it is assumed that a prima facie case has been made out, there is ample other evidence presented by MBIA that shows the existence of genuine, triable issues of fact. Indeed, Bear Stearns cites deposition testimony from Desharnais that MBIA would not have allowed a deal to close unless the due diligence results had been received and evaluated. While there is no dispute that MBIA did not evaluate the purported due diligence results provided by Bear Stearns, there is also no dispute that the MDMC reports (which could be found to be the due diligence results that were supposed to be provided) were never provided to MBIA, though it was asking for them. 
Withholding the due diligence results so as to take the time to disguise their true import and delivering them only at the last-minute without disclosure of the underlying problems known to the underwriter may be found to have thwarted the insurer's ability to protect itself. MBIA's failure to disclose the MDMC reports, particularly the last ones issued on September 25, 2006, and failure to disclose the problems therewith may be found to have been relied upon by MBIA in its election to proceed with the transaction, notwithstanding MBIA's own failure to actually [*10]look at the altered documents.
That there is no evidence that Bear Stearns knew what level of results MBIA would find acceptable is not determinative. The evidence is undisputed on this record that Bear Stearns knew, or was concerned, that the reports of MDMC, up to and including the last ones, would be viewed unfavorably by MBIA. Indeed, both Durden and Mongelluzzo knew that there were big issues with the due diligence. Bear Stearns' argument is refuted by the evidence which shows that Bear Stearns was sufficiently concerned with the results that it worked with MDMC to strip out negative information and, even after MDMC turned in its final product, Bear Stearns altered the report even more and delayed sending even this altered product until the last minute. In any event, Desharnais has testified that the loan file due diligence review was "factual" in nature; MBIA had no insight to give, rather MBIA expected that the due diligence report would provide information regarding what was discovered in the loan file review conducted at GMACM's premises.
For these reasons, the Court concludes that there is evidence from which a reasonable fact-finder could rationally conclude that MBIA relied upon Bear Stearns' non-disclosures and concealments. While the evidence could also support a contrary conclusion, there are triable issues, particularly when it is considered that summary judgment is a drastic remedy and any doubt should be resolved in favor of affording MBIA the opportunity to present its evidence at trial.
THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER
MBIA ACTUALLY RELIED ON BEAR STEARNS' FAILURE TO DISCLOSE
Bear Stearns contends that any reliance on its failures to disclose by MBIA is not justifiable, as a matter of law, because MBIA was a sophisticated party, advised by counsel, and able to conduct whatever due diligence it desired before proceeding with the transaction. Bear Stearns further points out that MBIA had experience in these sorts of securitization transactions, had the opportunity to raise questions or ask for information, would not have relied on a third party's assurances, and failed to actually look at the report it received. As to the last point, Bear Stearns points out that both Desharnais and Murray testified that the absence of loan grades from a due diligence report is something that would have been noticed.
The Court cannot hold that reliance by MBIA on Bear Stearns' failure to timely provide the MDMC reports and failure to truthfully reveal the reasons for the delay in their transmittal was unjustified as a matter of law. 
The evidence on this record is that it was standard practice for an underwriter to arrange for due diligence review of loan files in advance of the selection of an insurer. This was done because the underwriter knew that the insurer would want to have such due diligence conducted and starting the due diligence earlier would avoid delays in the completion of the transaction. Given that GMACM and Bear Stearns promised to share the loan file due diligence results with MBIA, MBIA cannot be faulted for not conducting its own loan file due diligence review.
While MBIA did receive the "loan tape" containing information regarding the loans, and conducted its own review of that information, it is evident that the practice was that a "loan tape" review was not regarded, in common practice, as sufficient. In addition, a review of a sample of physical loan files was required. Whether MBIA did realize, or should have realized, the depth of the problems in this transaction from its "loan tape" review, thus rendering any reliance on [*11]Bear Stearns' conduct in relation to the MDMC review unreasonable, is a question of fact. Further, as noted previously, when Bear Stearns sent a revised "loan tape", it advised MBIA that the "loan tape" had been revised and provided a brief explanation.
As this Court has previously discussed in the prior Decisions, MBIA cannot claim it was victimized by Bear Stearns' actual fraud in sending an altered report to MBIA because MBIA never looked at the September 27, 2006 email and its attachment. Likewise, as the flip side of the same coin, the fact finder may consider whether any reliance by MBIA on the acts of fraudulent concealment engaged in by Bear Stearns was unjustified or unreasonable in light of what MBIA would have learned if it had looked at the altered due diligence report.
The gist of the fraudulent concealment claim is that Bear Stearns never actually provided MDMC's reports to MBIA and Bear Stearns failed to disclose: a) that MDMC's "final" report showed that there were problems with the collateral pool; b) that because GMACM would not let any loans out of the pool, both MDMC and Bear Stearns engaged in a process of attempting to sanitize the due diligence results; c) that the process of attempting to sanitize the results delayed the transmittal of any reports to MBIA; d) that MDMC's final report was not sent to MBIA; and e) that the report, sent at the last minute to MBIA by Bear Stearns, was not a report that had been approved, or even reviewed, by MDMC. There are clear questions of fact as to whether Bear Stearns' conduct included acts of active concealment and whether Bear Stearns' actions thwarted MBIA's own efforts, if any, to fulfill its own responsibilities to protect itself.
It is for this reason that Bear Stearns' reliance on the principle set forth in cases such as Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 17 NY3d 269, 278-279 (2011) and HSH Nordbank AG v UBS AG, 95 AD3d 185, 194 (1st Dept 2012) is unavailing. Those cases state that if the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transactions by misrepresentations. Here, there is evidence that material facts not disclosed were exclusively within Bear Stearns' knowledge [FN3]
; there is evidence that would support a finding that MBIA, despite the use of ordinary intelligence and reasonable efforts, could not have ascertained knowledge of the concealed facts [FN4]
; and there is evidence which would support a finding that Bear Stearns' actions hindered MBIA's efforts to protect itself. In the latter regard, such evidence includes evidence that Bear Stearns' employees were asking for the due diligence report and required the due diligence report but Bear Stearns was declining to provide it and was not disclosing the reasons for its refusal to release the report. Further, the last-minute release of the [*12]altered report may have hindered MBIA's efforts to protect itself, though, of course, the fact finder could conclude that MBIA could have readily protected itself by asking to adjourn the closing. But Bear Stearns knew something that MBIA did not — the loan file due diligence review had shown the presence of considerable issues.
In KNK Enters. v Harriman Enters., Inc., 33 AD3d 872 (2d Dept 2006), the Appellate Division held, as Bear Stearns points out, that the plaintiff there could not show reasonable or justifiable reliance because it, represented by counsel, had decided to proceed with the transaction despite knowledge that it had not received full information concerning the transaction. That determination was made after a non-jury trial, not upon summary judgment. Here, there are clear issues of fact as to whether MBIA had full information concerning the transaction. 
There are certainly facts present that could support a finding that reliance by MBIA was not reasonable or justifiable, such as its own "loan tape" review, its own ability to demand production of the MDMC report rather than abide delays, its own ability to seek advice of counsel or to adjourn the closing, and its own failure to review the altered report. But these are not the only facts and, thus, this case is not, in the view of this Court, one of those rare cases in which the issue of justifiable reliance may be summarily resolved as a matter of law (see KSW Mech. Servs., Inc. v Willis of New York, Inc., 63 AD3d 411 [1st Dept 2009]; Brunetti v Musallam, 11 AD3d 280 [1st Dept 2004]).
Accordingly, the Court shall not grant summary judgment to Bear Stearns on the ground that justifiable reliance cannot be proven.
CONCLUSION
The Court has considered the following papers:
(1)Notice of Motion dated August 31, 2015;
(2)Defendant's Statement of Undisputed Facts, dated August 31, 2015;
(3)Affirmation of Anastasia A. Angelova, Esq.,dated August 31, 2015, together with the exhibits annexed thereto;
(4)Defendant's Memorandum of Law in Support of Motion, dated August 31, 2015;
(5)Affirmation of Marc L. Greenwald, Esq., dated September 30, 2015, together with the exhibits annexed thereto;
(6)Plaintiff's Memorandum of Law In Opposition to Motion, dated September 30, 2015;
(7)Plaintiff's Responses to Defendant's Statement of Undisputed Facts, dated September 30, 2015;
(8)Reply Affirmation of Anastasia A. Angelova, dated October 15, 2015, together with the exhibit annexed thereto;
(9)Defendant's Reply to Plaintiff's Responses to Defendant's Statement of Undisputed Facts, dated October 15, 2015;
(10)Defendant's Reply Memorandum of Law, dated October 15, 2015.
Based on the foregoing papers and for the reasons stated, it is hereby
ORDERED that the motion of Defendant J.P. Morgan Securities LLC, f/k/a Bear, Stearns & Co., Inc., pursuant to CPLR 3212, for summary judgment against Plaintiff MBIA Insurance Corporation shall be, and is hereby denied, and it is further
ORDERED that counsel for the parties shall appear before this Court on June 16, 2016 at 9:30 a.m. for the purpose of scheduling a date for trial and for such other purposes as may be appropriate; and it is further
ORDERED that the conference hereinabove ordered shall not be adjourned without the prior written consent of the Court.
The foregoing constitutes the Decision and Order of this Court.
Dated: White Plains, New York
June 6, 2016
E N T E R :
ALAN D. SCHEINKMAN
Justice of the Supreme Court



Footnotes

Footnote 1:There is no requirement that proof be submitted in the form of an affidavit, as opposed to other acceptable forms, such as deposition testimony (Muniz v Bacchus, 282 AD2d 387 [1st Dept 2001]).

Footnote 2:Essentially the same analysis applies to the other documents referenced by Bear Stearns, e.g., the Mortgage Loan Purchase Agreement, the Underwriting Agreement, the Prospectus Supplement, and the Indemnification Agreement.

Footnote 3:MDMC had knowledge of the facts, up to the point that it delivered its truly final report on September 25, 2006. Bear Stearns, the evidence indicates, had exclusive knowledge of what transpired thereafter.

Footnote 4:As has been previously noted, it appears that MBIA did not learn about Bear Stearns' due diligence conduct until it conducted discovery in an action it brought against GMACM in 2010 (MBIA Ins. Co. v GMAC Mortgage LLC, 30 Misc 3d 856, 856 [Sup Ct NY County 2010]) (see May 2014 Decision at 4)).